UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| v. | ) | Misc. No. 1:07-mc-00387-RCL |
| | ) | |
| FARZAD DARUI, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT FARZAD DARUI'S BRIEF IN OPPOSITION
TO MOTION TO QUASH SUBPOENA TO ABDULLAH KHOUJ**

PRELIMINARY STATEMENT

This case is unusual in relation to run-of-the-mill fraud cases in that the entire

prosecution is based upon accusations leveled by one person: Abdullah Khouj. Khouj

complains in his motion to quash that Farzad Darui has requested a "disturbing array of

private, and mostly confidential information . . . ." Indeed, much of the information

requested is private in nature, and some may be considered confidential. But the

requested information is "disturbing" only insofar as it will demonstrate conclusively that

Darui's principal accuser was untruthful under oath, and that Khouj (and his need, among

other things, to support his "wives") approved the payments from his personal account to

Darui.

Khouj alleges that Darui misdirected funds from The Islamic Center of

Washington (the "Center") to different businesses owned by Darui. Darui states—and

will prove at trial—that the payments to which Khouj refers were 1) paid out of Khouj's

personal Bank of America account (as opposed to a business account owned by the

Center), and 2) that all such payments were authorized by Khouj to satisfy debts Khouj

owed to Darui, including debt to house and feed Khouj's "wives." Without reasonable

access to Khouj's documents—which Darui has requested in a narrowly drafted subpoena[1]—Darui will unconstitutionally be denied the right to defend himself.

As the Supreme Court has recognized, "[t]he ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." *United States v. Nixon*, 418 U.S. 683, 709 (1974).  Thus, the Constitution affords criminal defendants the right to obtain evidence and, where necessary, to compel its production.  *Id.* at 711.  To protect and enforce that right, Rule 17(c) authorizes defendants to subpoena documents from third parties and, where appropriate, to obtain those documents in advance of trial.  *See Bowman Dairy Co. v. United States*, 341 U.S. 214, 219-20 (1951).  A trial court's power to enforce such subpoenas is a "fundamental instrument of justice" in a criminal case.  *United States v. Liddy*, 354 F. Supp. 208, 211 (D.D.C. 1972).

Darui seeks the production by subpoena of evidence that will demonstrate that his accuser, Khouj, has lied under oath regarding their relationship and the true reasons for the payments at issue.  *See* Subpoena to Abdullah M. Khouj, attached as Exhibit 1.  Such evidence is essential to Darui's defense to the supposed scheme to defraud.  With due respect for the necessity of this evidence, this Court should quash or modify the subpoena only "if compliance would be unreasonable or oppressive."  *See* Fed. R. Crim. P. 17(c)(2).  Khouj offers little or no basis to support such a finding and ignores Darui's version of events.

---

[1]  Darui initially served a subpoena on Khouj that was broader in scope.  After speaking with Khouj's counsel, Darui withdrew the first subpoena and issued a superseding subpoena, which significantly narrowed the requests in terms of quantity, breadth, and temporal scope.  As such, the subpoena at issue can hardly be characterized by Khouj as burdensome.

Further, Khouj's counsel, Williams & Connolly, previously represented the Center in a civil action filed in the United States District Court for the Eastern District of Virginia that was based on the same allegations here.[2]  In that litigation, the Center proffered an affidavit from Khouj that put a number of the requested documents at issue. Furthermore, the Khouj affidavit contained a number of indisputably false statements, as demonstrated by the *Brady* material recently provided by the government.  The documents sought by the subpoena will further support the falsity of the affidavit, the lack of credibility of the government's main witness and accuser, Khouj, and, consequently, undermine the government's alleged scheme to defraud.  Under these circumstances, the Motion to Quash should be denied.

<u>THE LAW</u>

"A subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise."  *Nixon*, 418 U.S. at 698.  In *Nixon*, the Supreme Court held that if a subpoena meets three criteria—relevance, admissibility, and specificity—that subpoena should be enforced.  *See id.* at 700.  While paying lip service to that standard, Khouj attempts to quash Darui's subpoena based on an incorrect interpretation of the law and a blind eye to his defense.  In Khouj's view, to obtain enforcement of a subpoena, a party must identify with particularity the exact document he seeks, describe the precise content it contains, and establish with certainty that it will be admissible at trial.  If the standard were such, a party would rarely (if ever) be entitled to

---

[2]  As evidenced by meetings with counsel for the government, the case special agent, and the provision of documents, it is apparent that the Center, Khouj, and Williams & Connolly have cooperated with the government in this prosecution.  Presumably, such cooperation was no more burdensome than Darui's requests aimed at defending himself.

third-party documentary evidence in advance of trial, and the constitutional purposes underlying Rule 17(c) would be eviscerated.

*Nixon* makes clear the law imposes no such burden. In that case, the government subpoenaed for trial tape recordings and documents relating to conversations between the President and certain aides and advisors. The Court upheld the subpoena, notwithstanding the government's inability to "describe fully" the contents of the materials, or to say with certainty they contained admissible evidence. Rather, the Court held that it is adequate to show "a sufficient likelihood" that the documents contain material "relevant to the offenses charged in the indictment," and to make a "sufficient preliminary showing" that the material sought "contains evidence admissible" at trial. 418 U.S. at 700. The Court acknowledged it would be impossible for a party—in advance of actually receiving the documents—to say precisely what evidentiary value they might have. *See id.* It also recognized that a party cannot necessarily pinpoint, before a trial begins, the exact basis on which a document may be admitted. *See id.* at 702 (enforcing the subpoena because there were "valid potential evidentiary uses" for the material sought). Therefore, the Court held that a subpoena can be enforced based on "rational inference[s]"—drawn from the information available at the time—that the evidence sought would "relate to the offenses charged in the indictment" and could likely be admitted at trial. *Id.* at 700.

*Nixon* also made clear that it is perfectly permissible for a court to grant access to potential witness impeachment evidence before a trial begins. This allowance is of critical importance where, as here, the government's case is based almost exclusively on the testimony of one witness: Khouj. In *Nixon*, the Court recognized that, although "the

4

need for evidence to impeach witnesses" might not "generally" be sufficient to require pre-trial production, this rule is not absolute and must yield where circumstances require it. In *Nixon*, the Court concluded that "the analysis and possible transcription of the tapes [at issue] may take a significant period of time." Therefore, it was well within the district court's discretion to order pre-trial return. Doing so would ensure that the government could "properly prepare" its case and prevent unreasonable delay at trial. *See id.* at 699, 701-02. As shown below, the same circumstances are present here.

Lower courts have remained faithful to the Supreme Court's teachings when considering pre-trial subpoenas issued by criminal defendants. They have applied Nixon's "sufficient likelihood" standard in considering a document's potential relevance. *See, e.g., United States v. LaRouche Campaign*, 841 F.2d 1176, 1180 (1st Cir. 1988) (circumstantial evidence "supports the district court's finding of [a] likelihood that the outtakes would reveal inconsistent statements and bias"); *United States v. Poindexter*, 725 F. Supp. 13, 30 (D.D.C. 1989). And they have rejected a benchmark of "exquisite specificity" that would require a defendant to identify with particularity each of the documents sought and what specific evidence those documents contain. *See United States v. Poindexter*, 727 F. Supp. 1501, 1510 (D.D.C. 1989); *United States v. Haldeman*, 559 F.2d 31, 76 n.92 (D.C. Cir. 1976) ("Now, if a paper be in possession of the opposite party, what statement of its contents or applicability can be expected from the person who claims its production, he not precisely knowing its contents?") (citation and internal quotation marks omitted). Rather, it is sufficient for a defendant to explain what he "reasonably . . . believe[s] to be contained in the documents sought," and why that

material may be relevant to his defense. *See United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991).

Courts also do not require defendants to establish with certainty that a document will be admissible before trial begins—recognizing it would be almost impossible to do so. *See United States v. Orena*, 883 F. Supp. 849, 868 (S.D.N.Y. 1995). It is sufficient that the documents are "at least potentially admissible" or might "form the basis for eliciting certain testimony at trial." *Id.* (enforcing subpoena because documents might be used as, e.g., recorded recollections). What is more, consistent with *Nixon*, courts often enforce subpoenas seeking documents with potential witness impeachment value—particularly where, as here, the evidence relates to individuals who are virtually certain to testify and there is a clear indication of what they will say. *See, e.g., LaRouche Campaign*, 841 F.2d at 1180; *United States v. King*, 194 F.R.D. 569, 574 (E.D. Va. 2000); *Liddy*, 354 F. Supp. at 215 (granting pre-trial "access to materials which contain prior statements of the witness, statements that possibly might be admissible into evidence to discredit or impeach that witness") (emphasis added). Indeed, "[i]f impeachment evidence is available, it is critical that the defendants have access to it," *id.* at 215, and well within a trial court's discretion to order such access in advance of trial, *see Nixon*, 418 U.S. at 702; *LaRouche*, 841 F.2d at 1180.

**1.      There is a "sufficient likelihood" that the documents sought are relevant to the charges and Darui's defense, and the government's recently-produced <u>Brady</u> material demonstrates that Darui's defense is not created "out of thin air."**

The Center and Khouj have a vested interest in denying Darui the means of demonstrating that the allegations are false. In August 2006, the Center sued Darui for not only more than $300,000.00, but also for punitive damages. And they subsequently set in motion a criminal prosecution based on the same false statements and perjury used in the civil case. As noted above, the government has provided certain evidence conclusively demonstrating the falsity of various claims in an affidavit filed by Khouj in the civil action.

As an example, Khouj stated under oath in his affidavit in the civil case that:

6.      Mr. Darui told me that the Center could not commission an audit, as I repeatedly requested, until it obtained its cancelled checks. He told me that the cancelled checks were sent to the Center's accountants. After Mr. Darui's repeated delays in commissioning an audit of the Center's finances, I requested the cancelled checks from the Center's accountants myself. However, the accountants told me that they did not have, and never had, the cancelled checks.

7.      I then contacted the Center's bank, Bank of America, and learned that, without my knowledge or authorization, Mr. Darui had directed Bank of America to mail the cancelled checks to a Post Office box that he opened. In this way, Mr. Darui was able to hide from me and others at the Center his fraud, because the cancelled checks showing the altered payee names were mailed directly to him at a place to which no one at the Center knew about or had access.

8.      After I learned this, I requested a copy of the cancelled checks, directly from Bank of America. When I reviewed them, I immediately saw that the copies of the cancelled checks showed *that they were cashed by numerous companies that I had never seen, and to which I had never authorized the payment of any of the Center's funds. I have subsequently learned that the payees on these altered checks were companies owned and/or controlled by Mr. Darui.*

Declaration of Dr. Abdullah M. Khouj in Opposition to Defendant's Motion to Dismiss Or, In the Alternative, Motion to Stay Proceedings (attached as Exhibit 2), *The Islamic Center of Washington, D.C. v. Farzad Darui*, In the United States District Court for the Eastern District of Virginia, Civil Action No. 1:06-cv-1056 (emphasis added).

Despite these statements under oath and subject to the penalty for perjury, the government has provided two checks *signed by Khouj* payable to Blue Line Travel, the "company[y] that [he] had never seen, and to which [he] had never authorized the payment of any of the Center's funds." *See* checks payable to Blue Line Travel, attached as Exhibit 3. Darui has reason to believe there are more such checks and, therefore, requested them in his subpoena. *See* subpoena request # 14.

Additionally, the government provided Darui's counsel a list of the checks at issue. On that list was check # 7866, a Center Administrative account check also made out to Blue Line Travel, Inc. and signed by Khouj. During a thorough review of the documents seized during the government's searches, Darui's counsel (and subsequently the government) found the original cancelled check # 7866. It appears to be the only extant original cancelled check of all the checks at issue.[3] The government has since removed check # 7866 from its list, now admitting it was genuine. Khouj's true problem is not the nature, scope, or number of the documents sought, but that those documents will demonstrate that he has perjured himself.

Khouj's position in his Motion to Quash ignores one entire side of this adversary proceeding—the defense. Khouj asserts that Darui's defense and claims against Khouj

---

[3] Only Khouj and Darui had the key to the storage room where all the original cancelled checks were kept. When Darui left for vacation in August 2006, a decade's worth of original cancelled checks were there. Darui was never allowed to return to the Center. The government states it found no original cancelled checks at the storage site.

are "created out of thin air."  To the contrary.  As demonstrated by the government's recently-produced *Brady* material, Darui's defense is meritorious, and created not out of thin air, but out of concrete documentary evidence that cannot be ignored.  The single extant <u>original</u> check—even if considered in isolation—is evidence that Darui's defense is anything but grounded in reality.  The Court need not engage in speculation.

Many of the requests require the production of (presumably) only one document.  For example, request # 1 seeks a contract between the Center and Zaal, Inc., one of Darui's companies, that was signed by Khouj.  That document, which existed at one time, further demonstrates Khouj's knowledge of Darui's other companies, contrary to his affidavit.  Similarly, requests #s 2, 11, 12, 13, and 14, should be easy for Khouj to respond to.  Certainly, if Khouj has cancelled checks made out to Darui, Blue Line Travel, or ZAAL, as requested in request # 14, these documents are relevant and admissible to impeach Khouj.  Darui already has three checks to Blue Line Travel signed by Khouj.  The information regarding Khouj's "wives" (requests #s 3, 4, 5, and 9) goes to the heart of Darui's defense:  that the payments were, in fact, paid out of Khouj's personal account for the maintenance and support of his various "wives."

Finally, the financial information requested from Khouj has a threefold purpose.  First, it will demonstrate that the money the government claims belonged to the Center in reality was paid to Khouj by the Saudis, and owned and maintained by Khouj in a personal (as opposed to business) account at Bank of America.[4]  Second, it will

---

[4]  The fact that the "Special Account" is Khouj's personal account, rather than a business account owned by the Center, was confirmed in a 5-minute telephone conversation with Bank of America.  Indeed, the government's own documents provided in discovery conclusively demonstrate that the account was opened with Khouj's personal Tax Identification Number (the equivalent of a social security number) and not the Federal Tax ID Number assigned to the Center.  The name of the account is irrelevant to the

demonstrate whether Khouj received additional monies from the Saudis or some other source that he also used to support his "wives."  Third, this information will demonstrate whether Khouj paid taxes on this money as personal income.  Under the circumstances, Darui has shown a "sufficient likelihood" of relevance and admissibility of the documents sought.

**2.      *The temporal scope of various requests is a direct result of Darui's length of employment with the Islamic Center.***

Khouj complains of the temporal scope of some of the requests.  At first glance that scope could appear sufficiently broad to raise a judicial eyebrow.  But the scope is a direct by-product of the length of Darui's association with Khouj and the Islamic Center—a period of over 20 years.  The long-term debt incurred by Khouj for the housing and feeding of his "wives" spanned that time period.  And the treatment by the Center of certain expenses during that time period—for example, payments to certain informers regarding radical Islamist activity and how those were concealed by Khouj from the Saudis—is also central to Darui's defense.  In that respect alone, this case is unusual with respect to "third party" subpoenas.  In this case, Khouj and the Center—who have a civil (monetary) litigation interest in this matter, are practically parties (and, indeed, are direct sources, along with their counsel, of the government's mistaken allegations).

**3.      *The individual requests directly support Darui's defense and are sufficiently specific.***

Invoking, as the Center did in its Motion to Quash, the "fishing expedition," metaphor, Khouj identifies particular requests as violating the specificity requirement of Rule 17(c).  "Of course one person's fishing expedition is another's exhaustive

---

ownership of the account.  If necessary, Darui intends to call a representative of Bank of America to testify that the Special Account was owned by Khouj, not the Center.

investigation." *United States v. Tomison*, 969 F. Supp. 587, 594 (D. Cal. 1997) (describing as "brass" the government's objection to fishing expeditions, given its routine behavior relative to subpoenas duces tecum issued in connection with grand jury investigations, and holding that government lacks standing to move to quash a defendant's subpoena *duces tecum*).

Each category of documents sought will demonstrate that:

1)    Khouj had actual knowledge of and, on behalf of the Islamic Center, approved of Darui's actions (*see, e.g.*, subpoena requests #s 1, 8, 14);

2)    beyond the time frame of the indictment, these same activities had occurred with Khouj's full knowledge and approval (*see, e.g.*, subpoena requests #s 1, 8, 11, 14);

3)    Khouj's statements in his affidavit (regarding the same matters at issue in this case) were perjurious and knowingly untruthful (*see, e.g.*, subpoena requests #s 1, 6, 7, 8, 9, 11, 12, 13, 14);

4)    cash was paid to Khouj's "wives" consistent with Darui's assertions (*see, e.g.*, subpoena requests #s 2, 4, 5, 8); and,

5)    the so-called "Special Account," held in Khouj's taxpayer identification number was his own personal account (*see, e.g.*, subpoena requests #s 2, 3, 4, 5, 6, 7, 9, 10, 13).

**4.    *The Clerk advised counsel that the subpoena should not be made returnable to the Court.***

Khouj complains the subpoena has been made returnable to counsel's offices as opposed to the Clerk of this Court. The Clerk (who, presumably, does not want, and does not have the available space, to maintain in perpetuity a vast array of documents subpoenaed in every case) directed, in no uncertain terms, that documents responsive to a subpoena were not to be returned to the Court, but should be returnable to counsel's offices. In the context of a fraud prosecution covering approximately six years and involving the production of well over 100,000 documents already, the Clerk's position

seems eminently sensible.  Should the Court decide that Rule 17(c) requires otherwise, counsel will, of course, abide by that ruling.

<center>CONCLUSION</center>

Mr. Darui seeks specific, relevant, and admissible evidence to clear his name. Restricting his defense to only that which fits neatly within the government's theory of the case precludes his ability to challenge the false claims made by the Center and Khouj and denies his constitutional right to compulsory process.  Accordingly, the Motion to Quash should be denied.

<div align="center" style="display:inline-block">

FARZAD DARUI
By Counsel

</div>

_____/S/_____
Victoria Toensing (DC Bar #304980)
Joseph diGenova
Brady Toensing
diGENOVA & TOENSING, LLP
1776 K Street, N.W., Suite 737
Washington, D.C. 20006
(202) 289-7701
(202) 289-7706 (fax)
Counsel for Defendant


_____/S/_____
Aaron S. Book (DC Bar # 490815)
Steven T. Webster (admitted *pro hac vice*)
WEBSTER BOOK LLP
1 North King Street
Leesburg, Virginia 20176
703-779-8229
703-991-9178 (fax)
Counsel for Defendant

<center>12</center>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 7, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Richard M. Cooper, Esq.
Robert P. Watkins, Esq.
Ana C. Reyes, Esq.
Williams & Connolly
725 Twelfth Street N.W.
Washington, D.C.  20005-5901
202-434-5000
202-434-5029 (fax)
Counsel for Abdullah M. Khouj

Ronald Sharpe, Esq.
Assistant United States Attorney
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530


_____/S/_____
Aaron S. Book

# EXHIBIT 1

# Misc. No. 1:07-mc-00387-RCL

AO 89 (Rev. 11/91) Subpoena in a Criminal Case

# United States District Court

FOR THE _____ **DISTRICT OF** _____ COLUMBIA

UNITED STATES

### **SUBPOENA IN A CRIMINAL CASE**

V.

FARZAD DARUI

CASE NUMBER:

CRIM. NO. 1:07-CR-00149-RCL

TO:

DR. ABDULLAH M. KHOUJ
2551 MASSACHUSETTS AVE., NW
WASHINGTON, DC  20008

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE | COURTROOM |
|---|---|
| NOT APPLICABLE | N/A |
| | DATE AND TIME |

☒ YOU ARE ALSO COMMANDED to bring with you the following document(s) or object(s):

SEE ATTACHMENT "A"

| U.S. MAGISTRATE JUDGE OR CLERK OF COURT | DATE |
|---|---|
| NANCY MAYER-WHITTINGTON | |
| (By) Deputy Clerk | |

ATTORNEY'S NAME, ADDRESS AND PHONE NUMBER:

Victoria Toensing, 1776 K St., NW
Ste. 737, Washington, DC  20006
(202) 289-7701

**RETURN OF SERVICE**

| | DATE | PLACE |
|---|---|---|
| **RECEIVED BY SERVER** | | |
| **SERVED** | DATE | PLACE |

**SERVED ON (PRINT NAME)**

| **SERVED BY (PRINT NAME)** | | TITLE |
|---|---|---|

**STATEMENT OF SERVICE FEES**

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

**DECLARATION OF SERVER(2)**

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____

_Date_                          _Signature of Server_

_____

_Address of Server_

**ADDITIONAL INFORMATION**

(1) As to who may serve a subpoena and the manner of its service see Rule 17(d), Federal Rules of Criminal Procedure, or Rule 45(c), Federal Rules of Civil Procedure.

(2) "Fees and mileage need not be tendered to the witness upon service of a subpoena issued on behalf of the United States or an officer or agency thereof (Rule 45(c), Federal Rules of Civil Procedure Rule 17(d), Federal Rules of Criminal Procedure) or on behalf of certain indigent parties and criminal defendants who are unable to pay such costs (28 USC 1825, Rule 17(b) Federal Rules of Criminal Procedure)".

ATTACHMENT A

1. The agreement entered into on or about 2004 between Khouj and The Islamic Center with Farzad Darui and Zaal, Inc. and signed by Khouj, regarding services to be provided by Zaal;

2. All marriage certificates and/or licenses, and divorce certificates and/or decrees to which you applied and/or were a party between July 1, 1984 and December 31, 2006;

3. All requests to the Saudi Embassy and/or Saudi Government and written communication with the Saudi Embassy and/or Saudi Government regarding requests for marriage including, but not limited to, any "marriage" under Islamic Law, from July 1, 1984 through December 31, 2006;

4. All written contracts, agreements, and cash receipts to which Debbi Estrada was a party between January 1, 1990 and December 31, 2006;

5. All written contracts, agreements, and cash receipts to which Noufisa or Rachida Zouhri was a party between January 1, 1994 to present;

6. All personal IRS filings and returns for the tax years of 2002, 2003, 2004, 2005, and 2006;

7. All documents reflecting charitable contributions for tax years 2002 through 2006;

8. All personal bank statements and cancelled checks for all checking, savings, and investment accounts between January 1, 2000 and December 31, 2006;

9. Copies of all checks payable to Farzad Darui as referenced in the Federal Bureau of Investigation interview of Abdullah Khouj by Agent Brian Crews on January 16, 2007 ("Khouj gave Darui a check once a month for $600 to help [Debbi Estrada] with her rent.");

10. Records of all income received from Prince Bandar bin Sultan bin Abdulaziz Al-Saud, the Saudi Arabian Embassy, and/or the Saudi Arabian Government for the years 2000 through 2006;

11. Any document reflecting use of a Post Office Box between July 1, 1984 through December 31, 2006;

12. All Visa petitions, and residency applications filed on your own behalf between July 1, 1984 and December 31, 2006;

13. All W-8BEN filings and/or forms corresponding with any bank account to which you were a signatory from January 1, 2000 through December 31, 2006;

14. All cancelled checks made out to Farzad Darui, Blue Line Travel, Inc., Blue Line Travel, B.L.T., Zaal, Inc. and Zaal to which you were a signatory between January 1, 1992 and December 31, 2006.

    All requests for documents above include electronically stored information. These items must be returned to our office no later than the close of business on Friday, November 2, 2007.

    diGenova & Toensing
    1776 K St., NW, # 737
    Washington, DC  20006

# EXHIBIT 2

# Misc. No. 1:07-mc-00387-RCL

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| THE ISLAMIC CENTER OF<br>WASHINGTON, D.C., | ) |
| | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION NO: 1:06-cv-01056 |
| | ) CMH/BRP |
| v. | ) |
| | ) |
| FARZAD DARUI, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF DR. ABDULLAH M. KHOUJ IN
## OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR,
## IN THE ALTERNATIVE, MOTION TO STAY PROCEEDINGS

I, Dr. Abdullah M. Khouj, having personal knowledge of the facts contained in this declaration and being competent to testify to them, hereby state as follows:

1.    I am the Director of The Islamic Center of Washington, D.C. (the "Islamic Center" or the "Center"), the plaintiff in this matter.

2.    I understand that Farzad Darui, a former employee of the Islamic Center and the defendant in this matter, has requested a stay of these civil proceedings pending the outcome of criminal proceedings that have been brought against him by the office of the United States Attorney for the District of Columbia.

3.    A stay of these proceedings would impose a serious economic and religious hardship on the Islamic Center, its religious constituency and on the impoverished persons that the Center's charity work aids.

4.      From the mid-1990s until his dismissal from the Center in mid-2006, Mr. Darui has served as the Center's only bookkeeper and manager. In violation of the trust and responsibilities placed upon him, Mr. Darui engaged in an elaborate fraud to embezzle funds from the Center. In fact, he did embezzle over $300,000 from the Center by changing the payee names on checks after I had signed the checks. I believe that Mr. Darui stole funds from the Center by other means and the Center is currently investigating other fraud that he may have committed.

5.      The Center first learned of the existence of Mr. Darui's fraud in August 2006.

6.      Mr. Darui had told me that the Center could not commission an audit, as I repeatedly requested, until it obtained its cancelled checks. He told me that the cancelled checks were sent to the Center's accountants. After Mr. Darui's repeated delays in commissioning an audit of the Center's finances, I requested the cancelled checks from the Center's accountants myself. However, the accountants told me that they did not have, and had never had, the cancelled checks.

7.      I then contacted the Center's bank, Bank of America, and learned that, without my knowledge or authorization, Mr. Darui had directed Bank of America to mail the cancelled checks to a Post Office box that he opened. In this way, Mr. Darui was able to hide from me and others at the Center his fraud, because the cancelled checks showing the altered payee names were mailed directly to him at a place to which no one at the Center knew about or had access.

8.      After I learned of this, I requested a copy of the cancelled checks directly from Bank of America. When I reviewed them, I immediately saw that the copies of the cancelled checks showed that they were cashed by numerous companies that I had never seen, and to

2

which I had never authorized the payment of any of the Center's funds. I have subsequently

learned that the payees on these altered checks were companies owned and/or controlled by Mr.

Darui.

9.    Saudi Arabia supports the Islamic Center by providing it with funds every year to

cover the Center's operational costs. To document its expenditures, the Islamic Center routinely

provides the Saudi Arabian Embassy (the "Embassy") with copies of its financial records.

Accordingly, Mr. Darui provided the Embassy with copies of the Center's invoices along with

copies of the checks as I had originally signed them, *i.e.*, with the original payee names.

10.    After I received the cancelled checks from Bank of America, I requested from the

Embassy a copy of the checks that it had in its files. I received these copies in late August 2006.

I compared these two sets of checks and realized that Mr. Darui changed the payee names after I

signed the checks to companies that he owned and/or controlled. This was the first time that I

learned of Mr. Darui's fraud.

11.    Upon discovering that this fraud had occurred by comparing the two sets of

checks, I immediately called an emergency meeting of the Center's Board of Directors. The

Board met on September 5, 2006 and authorized me to hire professionals, including lawyers and

accountants, to aid me in conducting an investigation into Mr. Darui's activities. The Center

filed the current Complaint on September 15, 2006 and successfully served it on September 18,

2006.

12.    The Center's first priority once it recoups funds that were embezzled by Mr.

Darui will be to strengthen its charity work, which has suffered as a result of Mr. Darui's fraud

due to a lack of funds. For example, as part of its religious obligations, the Center distributes

3

food and other provisions to needy persons in its community. As part of his fraud, Mr. Darui depleted the Center's charity account and the Center has therefore not been able to fully satisfy this religious commandment.

13.     The Center also maintains the Dawa Program, through which the Center provides a copy of the Holy Quran and other literature on Islam to individual prisoners throughout the United States upon request. This program, which is based on religious commandment, has also suffered in the past few years as a result of Mr. Darui's fraud.

14.     A delay in recouping the funds embezzled by Mr. Darui will therefore negatively affect persons in the D.C. community who benefit from our charitable work and practitioners of Islam throughout the U.S. who benefit from our Dawa Program.

15.     The Center's second priority once it recoups funds that were embezzled by Mr. Darui will be to make much needed structural repairs to the Center, which contains a Mosque that is the regular place of worship for thousands of Muslims.

16.     For many years, I have asked Mr. Darui whether there was sufficient money in the Center's available funds to undertake several structural projects that the Mosque has needed. For the vast majority of these projects, Mr. Darui told me that the Center did not have the necessary funds to undertake them. I understand now that the money that could have gone to undertaking these projects had instead been embezzled by Mr. Darui.

17.     As a result of years of neglect occasioned by Mr. Darui's fraud, the Mosque is in serious need of major, and costly, renovations. One major expense is that stones throughout the Mosque have been permanently damaged and need to be replaced in order to ensure that the structural integrity of the Mosque is not compromised.

4

18.     As another example, the cooling tower of the Mosque needs to be replaced.

19.     Another major expense includes replacement of the plumbing and electrical systems throughout the building. I repeatedly requested of Mr. Darui that he have the plumbing and electrical systems fixed to function adequately, but he was evasive each time, even though there was (and are) physical evidence showing the continual leaking of the faucets. The basis for his evasiveness was his contention that the Center could not afford to undertake such a project.

20.     Another major expense includes the need to replace the windows in the Center. The windows are in such bad condition that they let in cold air during the winter and allow air conditioned air to escape during the summer. These leaks significantly add to the Center's heating and cooling costs.

21.     A delay in recouping the funds embezzled by Mr. Darui will therefore negatively affect the Center, which needs to undertake the repairs I have described but does not currently have the funds to do so.

22.     Finally, I am concerned that the longer Mr. Darui is able to avoid repaying the Center, the longer the above mentioned conditions continue, the worse they will become and the greater the cost will ultimately be to repair them.

\* \* \* \* \*

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is

true and correct to the best of my knowledge, information and belief.

Dr. Abdullah M. Khouj

Executed November _2_, 2006, in Washington, D.C.

6

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of November, 2006, I caused to be served, by first-class mail, a true and correct copy of the foregoing Plaintiff's Opposition to Defendant's Motion to Dismiss or, in the Alternative, Motion to Stay Proceedings upon counsel of record, at the following addresses:

Steven T. Webster, Esq.
Aaron S. Book
Webster Book LLP
30-D Catoctin Circle, S.E.
Leesburg, Virginia 20175

Victoria Toensing, Esq.
Brady Toensing, Esq.
diGenova & Toensing, LLP
1776 K Street, N.W., Suite 737
Washington, D.C. 20006

By: _____

Ana C. Reyes

# EXHIBIT 3

# Misc. No. 1:07-mc-00387-RCL

**ABDULLAH M. KHOUJ**
2550 MASSACHUSETTS AVE. NW.
WASHINGTON, DC 20008

15-122/540
00215

1481

8-28 2001

PAY TO THE ORDER OF ___Blue line Travel___ | $207.00

only two hundred seven and 00/100 _____ DOLLARS

**FIRST UNION**    First Union National Bank
of Washington, D.C.
Washington, DC

Performance Banking

FOR _____

⑆054001220⑆ ⑆0000540 8255 2⑈ 1481 ⑆0000020700⑈

Blue Line Travel, Inc.
5613 Leesburg Pike, Suite 21
Falls Church, VA 22041

▶031000011◀
FIRST UNION NATL SVC-871
PHILADELPHIA PA 08302001
0814419209

REQUEST 00002025424000000 207.00
ROLL ECIA    20010830  000000814419209+
JOB ECIA  P  ACCT 0521000054082552
REQUESTOR Margaret Rich
give to peggy

Margaret Rich
PA4292

**ABDULLAH M. KHOUJ**
2550 MASSACHUSETTS AVE. NW.
WASHINGTON, DC 20008

15-122/540
00215

1486

9-4 2001

PAY TO THE
ORDER OF _The Blue line Travel_____ | $224.00

only two hundred twenty four °°/₁₀₀ DOLLARS

**FIRST UNION**™  First Union National Bank
of Washington, D.C.
Washington, DC

_Performance Banking_

FOR _____

⑊054001220⑊ 1000054082552⑊ 1486 ⑊000002 2400⑊

Blue Line Travel Inc.
5613 Leesburge Pike, Suite 21
Falls Church, VA 22041

►0310000114
FIRST UNION NATL SVC-071
PHILADELPHIA PA 09062001

0816097188

REQUEST 00002025424000000 224.00
ROLL ECIA   20010906  000000816097188+
JOB ECIA  P  ACCT 0521000054082552
REQUESTOR Margaret Rich
give to peggy

Margaret Rich
PA4292