UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES, )<br>)<br>v.    )<br>)<br>FARZAD DARUI, )<br>)<br>Defendant. ) | Misc. No. 1:07-mc-00387-RCL |

**DEFENDANT FARZAD DARUI'S BRIEF IN OPPOSITION
TO MOTION OF ABDULLAH M. KHOUJ
TO QUASH THE SUBPOENAS SERVED BY DARUI ON THREE ENTITIES**

Preliminary Statement

Contrary to Khouj's accusations, Darui has not violated this Court's orders or oral instructions regarding early return subpoenas. At the direction of the Court after the status hearing on December 19, both the Court and the government were provided with all documents returned by SunTrust and Wachovia pursuant to Darui's Rule 17(c) subpoenas.

With respect to the subpoenas issued to the Postal Service, the Postal Service filed motions to quash. Both motions were denied in part and granted in part, and the Postal Service has been ordered to comply with the subpoenas by January 25, 2008. Khouj moves to quash those subpoenas as well. Notably, the documents requested by Darui's subpoenas to the Postal Service are the same documents that this Court ordered Khouj himself to produce. As such, Khouj can have little objection to these subpoenas.

Darui is using the Rule 17 subpoena power for one thing only: to obtain evidence of the truth, which will prove his innocence. Neither he nor his counsel is using (or abusing, as Khouj and the government—in its January 18 motion—suggest) the subpoena power to harass or embarrass any potential government witness. Khouj has demonstrated that he has been evasive (at best) and untruthful (at worst) with respect to a host of issues—from his relationship with Debbi Estrada to his knowledge of the companies that Darui owns.

Tellingly, the government has never put its star witness before the grand jury.[1]  However, a review of the Reports of Investigation ("302s") provided by the government reveals that Khouj was less-than-forthcoming with FBI investigators with respect to his relationship with Estrada.  Initially, Khouj all but denied that he knew the woman.  However, over the course of 14 months and at least *eight* interviews, Khouj changed his story.  Darui can only presume it was because the government had to return time and again to "clean up" various discrepancies from his attempt to conceal his relationship with Estrada.  At first it appears to be the government's discovery of regular $250 checks to Estrada from the Special Account.  Another discrepancy had to be addressed because witnesses saw Khouj regularly visit Estrada at apartments owned by Darui through Zaal, Inc.

1. ***Darui has complied with this Court's Orders and oral instructions relating to the challenged subpoenas.***

Darui filed his first motion for early return subpoenas on August 8, 2007.  The motion was unopposed by the government, and the Court entered an order on August 8, 2007, permitting Rule 17(c) subpoenas to be issued to a number of entities.  The return date for these subpoenas was September 12, 2007.  At the time the Order issued from the Court, there were additional entities that Darui had a basis to subpoena.  To facilitate this, Darui included in his proposed order a provision that he could submit additional agreed orders listing other entities to be subpoenaed for the September 12, 2007, return date.  As it turned out, Darui did not subpoena any other entities under the August 8 Order.

---

[1] Khouj's credibility is critical to this prosecution.  Why?  Because the government does not have any original "altered" checks in its case against Darui.  It has only copies.  And viewing these copies in juxtaposition reveals little.  The checks have the same number, same amount, same date, same signature, but different payees.  There is no visible sign of alteration.  Thus, Khouj's testimony is crucial to present the jury any evidence—beyond mere copies of two checks, identical except for the payees—that the cashed check was indeed the altered check.

The September 12, 2007, return date came and went (and, as a consequence, the August 8 Order mandating a September 12 return date had no further legal force). Darui became aware that there were, in fact, third-parties in possession of information necessary to his defense, so he filed a second motion for early return subpoenas on September 28, 2007. This motion also was unopposed by the government. The motion requested that Darui be permitted to issue early return subpoenas "to those individuals and entities likely to have records relevant to the transactions at issue in the Indictment and admissible in this proceeding." Defendant Farzad Darui's Unopposed Motion for Early Return Subpoenas Under Rule 17(c). The Court granted the motion in an Order dated October 3, 2007. In the Order, there were no restrictions on the individuals or entities that Darui was allowed to subpoena, and the Court specifically permitted that the subpoenas were returnable "prior to the trial date set in this matter." Order of October 3, 2007 (noting specifically that "the parties to this matter are in agreement that the Motion should be granted"). And, importantly, the October 3 Order related to the September 28 motion for additional early return subpoenas, not to the August 8 motion or Order.

In the November 19 meeting in chambers, Darui understood that future subpoenas were to be made returnable to the Court. Two subpoenas, to SunTrust and Wachovia, were issued that listed diGenova & Toensing and its address as the name and address of the issuing attorney. Erroneously, the attachment stated the documents were returnable to counsel's office and not to the Court. These two subpoenas did not indicate that the documents were returnable to the Court.[2]

On December 19, 2007, the Court held a status conference. At that conference, counsel for Darui indicated that some subpoenaed documents were returned to diGenova & Toensing

---

[2] All subsequent subpoenas, including those issued to the Postal Service, indicate that documents are returnable to chambers of The Honorable Royce C. Lamberth.

rather than to the Court. The Court indicated that counsel should forward a copy of all SunTrust and Wachovia documents to both the Court and the government, and that counsel could retain a copy. Accordingly, on December 21, Darui forwarded the returned documents to the Court and to the government along with a disc containing all responses to previously-issued subpoenas.[3] *See* Letter from Victoria Toensing to The Honorable Royce C. Lamberth, December 21, 2007 (attached as Exhibit 1). Once the government received the documents, it took no further action, although presumably it reviewed the subpoenas and documents and shared the information with its principal witness, Khouj, who filed his motion January 11, 2008.

2. ***The Court has already determined that documents relating to Khouj's Post Office Box should be produced.***

The Court ordered that the Postal Service produce all documents relating to the Post Office Box rented by Khouj. *See* Order, January 8, 2008 (ordering that the Postal Service produce documents responsive to the December 13, 2007, subpoena by January 25, 2008). The Court also ordered that the Postal Service produce all documents from February 2000 through February 2007 relating to Post Office Box 53188, the Post Office Box at issue in this case. *See id*. (ordering that the Postal Service produce documents responsive to the December 21, 2007, subpoena by January 25, 2008). These documents encompass the documents that the Court ordered Khouj to produce in accordance with its Order of December 18, 2007, which commanded that Khouj produce, among other things, "[a]ny document reflecting use of a Post Office Box between July 1, 1984 through December 31, 2006." Because Khouj claimed to have no such documents, Darui sought them from the Postal Service.

---

[3] When the Court received the SunTrust and Wachovia documents on Friday, December 21, Ms. June from chambers called the offices of diGenova & Toensing and inquired what action the Court was supposed to take with respect to the documents. Counsel for Darui indicated that they were following the Court's order and did not know what was to be done with them. Ms. June called back a few minutes later and stated that, after consulting with the Judge, so long as Darui had provided the materials to the government (which he had) that the matter had been handled appropriately.

Khouj had the opportunity to argue that such documents should not be produced, and he did so. Khouj, however, produced no documents responsive to the request. The Postal Service—represented by the United States Attorney—moved to quash as well. The Court determined the requested documents should be produced. As such, Khouj's motion to quash the Postal Service subpoenas should be denied.

3. **There is a "sufficient likelihood" that the documents sought are relevant to the charges and Darui's defense.**

"A subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise." *United States v. Nixon*, 418 U.S. at 698. In *Nixon*, the Supreme Court held that if a subpoena meets three criteria—relevance, admissibility, and specificity—that subpoena should be enforced. *See id.* at 700. It is adequate that a defendant show "a sufficient likelihood" that the documents contain material "relevant to the offenses charged in the indictment," and to make a "sufficient preliminary showing" that the material sought "contains evidence admissible" at trial. *Id.* With respect to the SunTrust and Wachovia subpoenas, the documents requested are relevant to the charges against Darui and his defense.

This case is, of course, about money. Darui must follow the money, both forwards and backwards as necessary, in order to prove his innocence. Darui has contended from the outset that the money that flowed from Khouj's account (called the "Special Account") to Darui's entities was repayment of a debt for the housing and feeding of Khouj's "wives," and that the repayment of this debt was at all times authorized by Khouj himself from a personal account held by Khouj. Both Khouj and the government initially responded that this "scheme" was preposterous. However, the FBI reports of interviews with Khouj (included in the *Jencks* materials produced by the government) provide a basis for Darui's version of events.

For example, Khouj attempts to conceal from the government the extent of his involvement with Estrada. In his first interview with the FBI (September 14, 2006), Khouj stated he "did not know" what a letter (from Darui's business lawyer) was referring to by asking about Estrada. Khouj explained that Estrada "did some work on the Center's newsletter" and was "paid about $500" monthly *by Darui*. This interview occurred at a time when Khouj erroneously thought Darui had vacated the United States to live in Mexico and would not return to contest his allegations.

In January 2007 (presumably after the FBI had found numerous checks to Estrada signed *by Khouj*), he told the FBI that he "tried to help by paying her rent for several years." He claimed that "Darui offered to rent her one of his apartments," and that he "gave Darui a check once a month for $600 to help with her rent."[4] Khouj also stated he "hired [Estrada] to be a typist for the Center's magazine, where she was paid $500 a month." "Khouj denied she was his girlfriend . . . " but admitted that "<u>on</u> <u>occasion</u> . . . he would stop by her apartment and deliver food to her," and "he may have written checks to help her from 1994 to 2003." (Emphasis added).

After one Estrada neighbor (coincidentally, an FBI employee who had worked with the case agent, Brian Crews) was interviewed and stated a Saudi male had visited Estrada *one to two times per week*, Khouj was interviewed for the sixth time. On June 6, 2007, almost nine months after his first interview with the FBI, Khouj admitted that his visits to bring her food were

---

[4] Defense counsel has never received copies of the two $600 checks that Khouj showed the FBI during the January interview. Darui's position has always been that, during a limited period of time, he received some checks for $550 from Khouj as partial payment for the rent; however, the actual monthly rents for the four furnished apartments where Estrada stayed ranged from $950 to $1500. The money paid by Khouj fell far short of the total rent that accrued during almost 13 years of Estrada's housing. Moreover, the amount did not reflect the cost of the damages Estrada continually inflicted on the apartments or the regular cash payments or food deliveries Darui made to Estrada at Khouj's request.

6

"often" and lasted "approximately one hour." He also admitted for the first time that in the late 1980s Estrada had "lived with [him] for a few months . . . at a townhouse owned by the Center at 2550 Massachusetts Avenue . . . ." He then changed the amount he had claimed he paid Darui saying it was "$550 per month to rent a small apartment Darui owned." Khouj denied living with Estrada for more than a few months.[5]

Finally, Khouj recites three addresses of apartments at which Ms. Estrada resided over the course of twelve years, from 1992 through 2004. All these addresses were of apartments owned by Darui through Zaal, Inc. And Darui has informed the government that he intends to produce a witness present at Khouj's marriage to another woman—an American—performed while Khouj was still married to his Saudi wife.

Darui permitted Khouj to accrue this debt because Khouj stated that he simply did not have funds available to pay Darui and could only contribute $550 per month for rents that ranged from $950 to $1500. Based upon Darui's friendship with Khouj, and his knowledge of Khouj's salary from the Center, Darui had no reason not to believe Khouj's representation. Only accidentally, and after the large debt had accrued, did Darui discover that Khouj had significant assets, housed at other local banks, that were more than sufficient for Khouj to repay his debt to Darui. Darui demanded to be repaid and Khouj agreed. Khouj said he wanted to use the funds provided him by the Saudis that were housed in Khouj's Bank of America account (the "Special Account"), but he did not want the Saudis to know about it. Khouj authorized Darui to make

---

[5] The 302s received by defense reflect that Khouj was interviewed by the government at least eight times over a 14-month period. Defense does not know whether Khouj was interviewed when no notes were taken. Except for two interviews, either Khouj's lawyer or another witness in the case, Fatoumata Goodwin, was present. At three of the eight interviews, Goodwin and a Williams & Connolly lawyer (representing both Khouj and the Center) were present.

certain checks payable to Darui's entities and attribute them to vendors of The Center. The vendors were then paid with a second check.

Khouj's intent was to conceal these payments from the Saudis, who were providing Khouj with approximately $500,000 per year *by checks made out to Khouj individually* and deposited in an account bearing his personal taxpayer identification number. Although the method Khouj and Darui used to facilitate the repayment of the debt may have been unsophisticated, it was not illegal.

Further, Khouj falsely stated to case agents that Darui embezzled some of the Saudi checks made payable to Khouj by depositing them directly into Darui's own account. The records returned by the banks in response to the subpoenas prove this statement false.[6]

As with Khouj's prior motion to quash, he asks the Court to ignore Darui's defense (as well as his own statements to the government—statements that are provably false). For example, Khouj claims that "[n]othing in the indictment alleges that Darui stole money from Khouj's personal bank accounts." Darui contends that the "Special Account" *is* Khouj's personal bank account. It is undisputed that Khouj opened it under his social security number, and that the checks from the Saudis that were deposited into it were made out to Abdullah Khouj—not to the Islamic Center or some other entity or person.

The information requested in the subpoenas is important to Darui's defense. Darui would not have sought it otherwise. However, if the Court determines that the requests exceed the permissible scope of Rule 17, Darui will comply with whatever modification of the subpoenas the Court deems appropriate.

---

[6] Notably, the subpoena returns also show that the bank statements of the SunTrust and Wachovia accounts were all mailed to Khouj at a Post Office Box in Washington, D.C.

## CONCLUSION

Mr. Darui seeks specific, relevant, and admissible evidence to clear his name. Through these third party subpoenas, he has obtained such information. Restricting his defense to only that which fits neatly within Khouj's version of the case precludes his ability to challenge the false claims made by the government, The Center, and Khouj, and denies his constitutional right to compulsory process. Accordingly, the motion to quash should be denied.

FARZAD DARUI  
By Counsel

_____/S/_____
Victoria Toensing (DC Bar #304980)
Joseph diGenova
Brady Toensing
diGENOVA & TOENSING, LLP
1776 K Street, N.W., Suite 737
Washington, D.C. 20006
(202) 289-7701
(202) 289-7706 (fax)
Counsel for Defendant


_____/S/_____
Aaron S. Book (DC Bar # 490815)
Steven T. Webster (admitted *pro hac vice*)
WEBSTER BOOK LLP
1 North King Street
Leesburg, Virginia 20176
703-779-8229
703-991-9178 (fax)
abook@websterbook.com
Counsel for Defendant

9

<u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on January 22, 2008, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Richard M. Cooper, Esq.
Robert P. Watkins, Esq.
Ana C. Reyes, Esq.
Williams & Connolly
725 Twelfth Street N.W.
Washington, D.C.  20005-5901
202-434-5000
202-434-5029 (fax)
Counsel for Abdullah M. Khouj

Ronald Sharpe, Esq.
Assistant United States Attorney
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530


   /S/
_____
Aaron S. Book (DC Bar # 490815)
WEBSTER BOOK LLP
1 North King Street
Leesburg, Virginia 20176
703-779-8229
703-991-9178 (fax)
abook@websterbook.com
Counsel for Defendant

# EXHIBIT 1

# Misc. No. 1:07-mc-00387-RCL

**dIGENOVA & TOENSING, LLP**
ATTORNEYS-AT-LAW

December 21, 2007

**Via Courier**

The Honorable Royce C. Lamberth
United States District Court
  for the District of Columbia
333 Constitution Avenue, NW
Room 2010
Washington, DC  20001

   Re: United States v. Farzad Darui 1:07-cr-00149-RCL

Dear Judge Lamberth:

  Enclosed are the documents received in response to our subpoenas of SunTrust and Wachovia Bank NA. In addition, a compact disc is enclosed containing responses to our subpoenas issued to various entities in the above referenced case.

               Sincerely,

               Victoria Toensing
               Counsel to Farzad Darui

1776 K STREET, NW · SUITE 737 · WASHINGTON, DC 20006
202-289-7701 · 202-289-7706 (FACSIMILE)